CARLITA RAMOS,                        )
                                      )
      Plaintiff,                )
                                      )
v.                                    )
                                      )        ORDER
CAROLINA MOTOR CLUB, INC.,            )
                                      )
      Defendant.                )
                                      )
_____ )

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment, (Doc. No. 26); its Memorandum in Support, (Doc. No. 27-1); Plaintiff's Response in Opposition, (Doc. No. 28); and Defendant's Reply, (Doc. No. 29). Defendant's Motion is ripe and ready for adjudication.  For the reasons set forth below, the Court **GRANTS in part and DENIES in part** Defendant's Motion for Summary Judgment.

## I.   BACKGROUND

### A.   Procedural Background.

On August 31, 2015, Plaintiff Carlita "Jackie" Ramos ("Plaintiff") was fired from Carolina Motor Club, Inc., also known as AAA Carolinas ("Defendant").  On October 19, 2015, Plaintiff filed a charge of discrimination with the EEOC, which thereafter issued a "right to sue" letter on December 19, 2016.  (Doc. No. 2-1 ¶25). This case was removed from Mecklenburg County Superior Court to the Western District of North Carolina on April 19, 2017.  (Doc. No. 1).  On March 30, 2018,

Defendant Carolina Motor Club moved for summary judgment. Oral argument regarding Defendant's Motion for Summary Judgment was heard on May 3, 2018.

B. <u>Factual Background.</u>

Plaintiff alleges that Defendant terminated her employment in discriminatory fashion. Defendant is a North Carolina non-profit known for its emergency roadside assistance and travel planning materials. (Doc. No. 27 at 2). A woman of Dominican descent, Plaintiff began working for Defendant in 2008 as a janitor. (Doc. No. 1-2 ¶11). In October of 2013, Plaintiff was promoted to her first managerial role as "Manager, Auto Touring and Production and Lobby." (<u>Id.</u> ¶12). In this role, Plaintiff managed a team of Production Specialists preparing various travel materials requested by AAA members. (<u>Id.</u>). In May of 2015, Plaintiff received another promotion, this time managing AAA's new warehouse, which was set to open at the end of that year. (<u>Id.</u> ¶13).

Around the time of her second managerial promotion, Plaintiff alleges that she was subjected to discriminatory comments. First, Defendant's IT Operations Manager, Rich Sheehan, called Plaintiff's accent ugly and nasty. He stated that he could not understand Plaintiff because she sounded like Sofia Vergara. (<u>Id.</u>). But Plaintiff's claim for discrimination revolves primarily on similar comments from Project Manager Janet Watts, who was charged with overseeing the setup of the new warehouse. (Doc. No. 1-2 ¶14). Watts would ask, "[c]an you do something about your accent," or "[c]an you speak English?" (<u>Id.</u> at 59, 63). Watts' actions escalated to screaming at Plaintiff in front of other employees. (<u>Id.</u>). In its most severe form,

Watts' actions appeared physically threatening to Plaintiff when Watts came within 12 inches of Plaintiff's face and she wagged her finger. (Id. ¶15). Plaintiff states that two others overheard the comments Watts made regarding Plaintiff: Alven Blue, an African-American employee who also reported to Watts, and Sereatha Harris, the Human Resources Generalist. (Doc. No. 28 at 4). Plaintiff claims that this treatment occurred in every interaction with Watts. (Doc. No. 27-1 at 45, 62).

Outside of commenting on Plaintiff's accent, Watts told Plaintiff two general derogatory remarks regarding other minorities. On one occasion, Watts told Plaintiff that Hispanic people made bad employees. (Doc. No. 27-1 at 68–69). On another, Watts told Plaintiff that she would not interview a man because he was an ex-veteran and black. (Doc. No. 28-1 at 32). Watts purportedly told Plaintiff that they did not know what would be on his mind. (Id.)

Plaintiff attempted to communicate to Watts and Sheehan that their behavior toward Plaintiff was disrespectful and discriminatory, but the pair's behavior continued. (Doc. No. 1-2 ¶15). So, Plaintiff turned to Harris in Human Resources. (Doc. No. 28 at 4). Despite believing Plaintiff that a hostile work environment existed, Harris did nothing regarding Plaintiff's concerns. (Id.). Plaintiff thereafter reported the discriminatory conduct to Human Resources Manager Frank Tatum, on July 9th, who in turn stated that she should talk to Sarah Henshall, the Vice President of Travel. (Doc. Nos. 1-2 ¶16; 28 at 4).

In August of 2015, Plaintiff reached Henshall directly. (Doc. No. 1-2 ¶19). Plaintiff conveyed to her Watts' behavior and the fact that Watts did not treat

Caucasians in a similar manner. (Id.). Plaintiff claims that Henshall immediately denied the allegations against Watts and told Plaintiff that Watts was a difficult person to work with. (Id.).

While Defendant's Anti-Discrimination and Harassment Complaint Policy required an investigation into Watts' alleged discriminatory behavior, Plaintiff states that Henshall and Tatum did just the opposite; the company began investigating Plaintiff instead. (Doc. No. 1-2 ¶20). This investigation, Plaintiff alleges, was a conspiracy to fire her. (Id.). Tatum interviewed approximately four people on Plaintiff's team, telling her that he merely wanted to check in with the employees since the process of setting up and moving the warehouse was a stressful one. (Id.).

Frustrated, Plaintiff then attempted to set up a meeting between herself, Henshall, and Watts to discern the discrimination issues and resolve the investigation Tatum was conducting. (Id. ¶21). Henshall scheduled Plaintiff's requested meeting only to cancel it and schedule a new meeting on August 31, 2015, between herself, Plaintiff, and Tatum. In this new meeting, Henshall informed Plaintiff that she was no longer a manager because she could not get along with Watts. (Id. ¶22). Henshall then told Plaintiff to interview for a position as a commissioned saleswoman. This new position was not salaried and required weekend shifts, and there was no guarantee that Plaintiff, who had worked for Defendant for approximately seven years, would even get it. (Id.); see also (Doc. No. 27-3 at 20) ("You didn't actually offer this job to Jackie, did you? You set up an interview for her … correct? [Henshall]: Correct").

Plaintiff filed a claim with the EEOC after her termination and now brings an action stating that her termination was a result of discrimination and constituted an act of retaliation for registering her complaints against Watts. (Id. ¶¶23, 24). Plaintiff claims that her position was later filled by Sheryl Fontaine, a Caucasian whose performance scores were lower than Plaintiff's. (Doc. No. 28 at 2, 10). Over a year after Fontaine assumed Plaintiff's former role, AAA promoted Kelly Lancaster—also Caucasian—to take part in the responsibilities that Plaintiff held. (Id.).

In its Motion for Summary Judgment, Defendant claims that this case boils down to "an employee who could not handle new managerial responsibilities but, instead, became fixated on the authority and 'respect' that she thought should accompany her 'Manager' title." (Doc. No. 27 at 1). While Defendant admits that Plaintiff enjoyed positive reviews while performing her first managerial role, it was after her second managerial promotion that the company noted problems with Plaintiff's performance. (Id. at 2, 3). Defendant states that from the start of her new duties, Plaintiff failed to prepare her team for the move into the warehouse. (Id. at 3). Defendant required its "Auto Touring" department to prepare for the move by first completing a thorough inventory. (Id.). However, due to Plaintiff's struggles in leading the effort, the resulting inventory was inaccurate and contained outdated materials. (Id. at 4). Once the date of the move to the new warehouse arrived, the Auto Touring department was not done packing. (Id.).

After the move, Defendant states that the problems with Plaintiff continued. Plaintiff failed to master the new inventory system despite receiving several training

sessions.  (Id.).  The result, Defendant states, was embarrassing as it had to issue "out of stock" notices to its members.  (Id.).

Defendant claims a second reason for Plaintiff's termination: her behavior. Plaintiff's performance issues created friction between Plaintiff and Watts.  While Watts focused her attention on critical issues, Plaintiff focused on miniscule tasks, such as hanging pictures or stocking hand sanitizer.  (Id.).  Plaintiff would then become frustrated with Watts when these miniscule problems were not directly addressed due to more pressing concerns on Watts' plate.  (Id.).  Plaintiff began complaining to other employees despite Henshall's instructions that all complaints go through Watts first.  (Id. at 5–6).

It was in the wake of the botched warehouse transition that Plaintiff approached HR.  (Id.).  Defendant states that Plaintiff complained of Watts' disrespect of her role as a manager—not necessarily that she was discriminated against.  (Id.).  Tatum referred Plaintiff to Henshall since both Plaintiff and Watts were supervisors.  Tatum also arranged for another HR partner to provide coaching to Watts.  (Id. at 6–7).  While Plaintiff met with Henshall, Tatum conducted interviews with Plaintiff's direct reports.  Tatum, Defendant states, relayed unanimous results from the interview: "the Auto Touring employees complained of stress relating to Plaintiff's performance inadequacies and were fed up with hearing Plaintiff complain about Ms. Watts and trivial building issues."  (Id. at 7).  In the wake of Tatum's review, Henshall met again with Plaintiff on August 19, 2015.  (Id.).

At this meeting, Henshall counseled Plaintiff to focus less on trivial matters and to not instigate concerns with Watts.[1]  (Id.).

Despite the meetings and reviews between Plaintiff, HR, and Henshall, another employee, Alvin Blue, came to Henshall stating that Plaintiff continued to create friction with her direct reports and Watts.[2]  (Id. at 8).  It was at that point, "in light of Plaintiff's performance deficiencies, her inability to work cohesively with her coworkers, and her failure to follow Ms. Henshall's directives on all of these matters, the Company relieved Plaintiff of her position as manager of Auto Touring, effective August 31, 2015."  (Id.).  After this decision, Henshall and Tatum arranged for Plaintiff to interview for a travel agent position in a location that was close to Plaintiff's residence.  (Id.).

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law. Id.  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories,

---

[1] Plaintiff denies that this counseling occurred.  (Doc. No. 28 at 7).
[2] Blue, in his declaration, now denies that he ever made such a comment to Henshall.  (Doc. No. 28-4 ¶12).

and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; accord <u>Sylvia Dev. Corp. v. Calvert Cty., Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. <u>Anderson</u>, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. <u>Id.</u> at 249-50.

## III.   DISCUSSION

Plaintiff's claims include violations of Title VII for hostile work environment, discrimination, and retaliation; violations of Section 1981 of the Civil Rights Act; and wrongful discharge in violation of public policy pursuant to North Carolina's the Equal Employment Practices Act, N.C. GEN. STAT. § 143-422.1, et seq., and the Occupational Safety and Health Act, N.C. GEN STAT. § 95-151.  (Doc. No. 1-2).

### A.  Plaintiff's Hostile Work Environment Claim

The protections of Title VII extend to situations where employees are required to work in a discriminatorily or abusively hostile environment.  Harris v. Forklift Sys., 510 U.S. 17, 21 (1993).  To succeed on a hostile work environment claim, a plaintiff must show: "(1) [she] experienced unwelcome harassment; (2) the harassment was based on [her] race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Baqir v. Principi, 434 F.3d 733, 745–46 (4th Cir. 2006); see also, Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015).  Defendant attacks Plaintiff's ability to establish the third and fourth elements.

### 1.  Severity and pervasiveness

The Fourth Circuit has long held that evaluating the severity and pervasiveness of harassment is "quintessentially a question of fact."  Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 227 (4th Cir. 2016).  However, at the

summary judgment stage, the Fourth Circuit interprets the severe/pervasive element as a high bar for plaintiffs to meet.  Not just any offensive conduct will suffice since Title VII is not a "general civility code."  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

"The 'severe or pervasive' element of a hostile work environment claim has both subjective and objective components."  <u>EEOC v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315 (4th Cir.2008) (internal quotations and citations omitted).  "First, the plaintiff must show that [s]he subjectively perceived the environment to be abusive. Next, the plaintiff must demonstrate that the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive."  <u>Id.</u>  When assessing the reasonable person standard, plaintiffs must identify "instances where the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." <u>Sunbelt Rentals, Inc.</u>, 521 F.3d at 316 (internal quotations omitted).

Defendant claims that Plaintiff admitted three times in her deposition that she received only four comments about her accent—one comment made by Sheehan and three comments made by Watts.  (Doc. No. 27-1 at 44, 69, 82, 88).  However, other portions of the Plaintiff's deposition allude to more pervasive behavior.  In that same deposition, Plaintiff testified that, "*anytime* [she would] have to deal with [Watts], she made a racist comment …, like, 'Speak—speak English. Can you speak English?'" (Doc. No. 27-1 at 45) (emphasis added).  Plaintiff also testified that, "*every time* that

[Plaintiff and Watts were by themselves], [Watts] *always* mention[s] [Plaintiff's] accent." (Id. at 63) (emphasis added).

"Credibility of conflicting testimony is not, on a summary judgment motion, an issue to be decided by the trial judge." Summerlin v. Edgar, 809 F.2d 1034, 1039 (4th Cir. 1987). Rather, "[t]he [Court's] job in deciding a motion for summary judgment under Rule 56(c) is not to decide issues of fact, but to determine whether there is any genuine issue of material fact to be decided." Id. The Court cannot turn a blind eye to the contradictions in Plaintiff's deposition.[3] These inconsistencies, and the concomitant credibility issues they raise, are for the jury to determine.

Courts must also look to the severity of comments. "[T]he required showing of severity … of the harassing conduct varies inversely with the pervasiveness … of the conduct." Glorioso v. Aireco Supply Inc., 1995 U.S. Dist. LEXIS 7071, 1995 WL 442203, *3 (D. Md. 1995) (quoting Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991)). Therefore, "an isolated incident[ ] of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." Fontainebleau, 786 F.3d at 277 (internal quotation marks omitted).

Again, Defendant points to Plaintiff's admission that Watts yelled at her on two of the three times she commented on Plaintiff's accent. (Doc. No. 27-1 at 68–69).

---

[3] Defendant cites Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984), for the proposition that a genuine issue of material fact is not created when the Court is faced between two conflicting versions of testimony. (Doc. No. 29 at 10). In that case, though, the Plaintiff submitted a subsequent affidavit that conflicted with their earlier deposition, thus manufacturing a genuine issue of material fact. Here, Plaintiff contradicts herself in the same deposition.

On one of those instances, Watts came within inches of Plaintiff's face. (Id. at 67, 80). Plaintiff maintains that all of these incidents were humiliating, one of which was physically threatening. (Doc. No. 28 at 17).

Courts have found sufficiently severe comments when defendants used particularly derogatory terms or made threats toward the plaintiff. See, e.g. Fontainebleau, 786 F.3d at 279–80 (finding a manager's use of the term "damn porch monkey" to an employee and his multiple threats "to get her" or "make her sorry" was properly considered extremely serious for a harassment claim); see also Hoyle v. Freightliner, LLC, 650 F.3d 321, 334 (4th Cir. 2011) (finding physically threatening conduct probative, but not determinative, of the severe/pervasive element); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (finding that repeated insults using derogatory terms sufficiently severe and pervasive). Courts also have looked to the status of the harasser. Fontainebleau, 786 F.3d at 278 ("a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.") (quoting Rodgers v. W.–S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993)).

Here, the comments made to Plaintiff did not feature derogatory terms, were not racial epithets used by a supervisor, nor did Watts employ physical threats. But they were discriminatory in nature. They do not appear to be an honest attempt to critique the communication skills necessary for her job. See Akwiwu v. Alabama Dep't of Youth Servs., 62 F. Supp. 3d 1291, 1301 (M.D. Ala. 2014) (finding a question as to whether comments on the plaintiff's accent were derogatory or merely expressed an inability to understand him). Furthermore, Watts' two comments to Plaintiff

regarding people of African-American and Hispanic descent are relevant to her claim. The Fourth Circuit has found that comments do not necessarily have to be directed at the plaintiff. Spriggs, 242 F.3d at 184.

This is not a case of isolated innuendo. Nor is this a case where harassing comments constituted a fraction of the total communications. If believed, Plaintiff lived with verbal assaults in almost every interaction. The offensive comments, when combined with conflicting testimony as to the pervasiveness of these offensive comments, result in a jury issue.

### 2. Imputable to Employer

The fourth element of a hostile work environment claim, asks whether liability can be imputed to the employer. "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Vance v. Ball State Univ., 570 U.S. 421 (2013). Here, Plaintiff alleges that Henshall, without investigating, merely stated Watts was teasing Plaintiff and being difficult to work with. In response, Defendant states that the offensive conduct Plaintiff complained about ceased after her July 9, 2015, meeting with Tatum. (Doc. Nos. 27 at 13; 29 at 12). At this meeting, Tatum recommended Plaintiff raise her concerns about Watts' general disrespect for her with Henshall and also arranged for Constance Darrington to coach Watts as she saw appropriate. (Doc. No. 27 at 13). Defendant concludes that it cannot be liable for a hostile work environment claim if the comments in question ceased after Plaintiff reported them. (Id. at 12–13).

Plaintiff asserts that the harassing comments continued. (Doc. No. 28 at 5, 25). This evidentiary conflict creates a credibility question for the jury.

B. Plaintiff's Prima Facie Discrimination Claim

In the absence of direct evidence, retaliation and discriminatory discharge claims share the McDonnell Douglas frame work. Under this framework,

> the plaintiff-employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the prima facie case "drops out of the picture" and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). To establish her prima facie discrimination claim, Plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he suffered adverse employment action; (3) [s]he was performing [her] job duties at a level that met [her] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

To fulfill these elements, Plaintiff states that: (1) she is a dark-skinned woman of Hispanic Dominican descent; (2) she was terminated from her managerial position; (3) she consistently "displayed exemplary performance"; and (4) Sheryl Fontaine, a Caucasian American, assumed Plaintiff's supervisory responsibilities. (Doc. No. 28 at 23–24).

The Court finds that Plaintiff cannot meet the third element of her prima facie discrimination claim. The record is replete with exhibits showing Plaintiff's inability to master the second managerial position. <u>See</u> (Doc. Nos. 27-2 at 21–23, 33; 27-9; 27-10; 27-12; 29-3 at 21–23). Plaintiff provides her performance review scores which Henshall filled out as proof to the contrary. (Doc. No. 29-13). While it helps Plaintiff that Henshall created these scores,[4] the scores show that Plaintiff received her highest score seven months prior to her termination. (Doc. No. 29-13) (showing 3.94 overall rating). It is, however, the performance of the employee *at the time of the termination* that matters. <u>Hess v. Atl. Marine Corps Communities Prop. Mgmt., LLC</u>, 7:13-CV-18-BO, 2014 WL 1321001, at *3 (E.D.N.C. Apr. 1, 2014) ("[I]t is well established that the defendants' perception of [a plaintiff's] performance at the time of her discharge is the relevant inquiry.") (citing <u>O'Connor v. Consol. Coin Caterers Corp.</u>, 56 F.3d 542, 547 (4th Cir.1995), <u>rev'd on other grounds</u> 517 U.S. 308 (1996), and <u>Holtz v. Jefferson Smurfit Corp.</u>, 408 F.Supp.2d 193, 205 (M.D.N.C.2006)). Therefore, Plaintiff's old performance scores are less than helpful to the Court's inquiry—especially when Plaintiff's current inquiry focuses on a new job with new responsibilities.

C. <u>Plaintiff's Prima Facie Retaliation Claim</u>

To establish a prima facie case of retaliation under Title VII, Plaintiff must prove "'(1) that she engaged in a protected activity,' as well as '(2) that her employer

---

[4] Plaintiffs cannot establish their performance abilities by promoting their own assessment. "It is the perception of the decision maker which is relevant."' <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 960-961 (4th Cir. 1996).

took an adverse employment action against her,' and '(3) that there was a causal link between the two events.'" Id. at 281 (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005)). Here, the Court finds that Plaintiff is able to meet her prima facie burden and has presented genuine issues of material fact as to her pretext argument.

Prior to proceeding to Plaintiff's evidence of a prima facie case, Plaintiff purports to have direct evidence of retaliation, which would prevent the Court from engaging in the McDonnell Douglas burden-shifting dance. Plaintiff claims Tatum testified that Plaintiff was terminated because of "[Plaintiff's] dissatisfaction with [Watts]." (Doc. No. 28 at 15) (quoting (Doc. No. 28-3 at 29–30)). Plaintiff states this statement amounts to an admission of retaliation. (Id.).

Tatum's deposition more accurately describes Plaintiff's habit of talking to others about her disagreements with Watts, resulting in workplace friction. (Doc. No. 28-3 at 29–31). This is not an admission of retaliation, but rather a description of Plaintiff's behavioral issues that Defendant cites as one reason for her termination. Exhibited emails support Tatum's testimony, showing other employees' comments on Plaintiff's habit of spreading statements about Jackie. See (Doc. Nos. 27-15; 27-16). Tatum's statement merely aligns with Defendant's purported reasoning for terminating Plaintiff: she displayed both behavioral and performance issues. (Doc. No. 27 at 17).

1.  Protected Activity

A protected activity requires an employee to "at least have actually opposed employment practices made unlawful by Title VII." <u>McNair v. Comput. Data Sys., Inc.</u>, No. 98-1110, 1999 U.S. App. LEXIS 1017, at **14–15 (4th Cir. Jan. 26, 1999) (finding "that appellant failed to satisfy this burden because she presented no evidence that [a] letter to DOE officials contained even implicit or indirect opposition to racial or sexual discrimination by anyone.").

Plaintiff argues that she used the term "discriminated" during her meetings with Tatum and Henshall. (Doc. No. 27 at 20). Defendant maintains that Plaintiff's meetings with Henshall and Tatum were merely about disrespect to her title and role in the warehouse move. (Doc. Nos. 27-2 at 81–85; 27-3 at 91–92). The Court finds another material fact in dispute. Unlike in <u>McKnight v. Nationwide Better Health Ins.</u>—a case cited by Defendant where the Court could analyze a plaintiff's written complaint in email form—here, there is conflicting testimony. No. CCB-12-801, 2014 U.S. Dist. LEXIS 72973, at *19 (D. Md. May 29, 2014). Plaintiff provides her calendar entry, which states that on July 9, she met with Tatum to "complain about Janet discrimination," thus providing corroboration of her version. (Doc. No. 28-5). Viewing the facts in favor of Plaintiff, the Court finds that she fulfills the first element of her prima facie case.

2.  Causal Link

"To prove a causal connection, [Plaintiff] must be able to show that [Defendant] fired [her] 'because the plaintiff engaged in a protected activity.'" <u>Holland</u>, 487 F.3d

at 218 (quoting <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 657 (4th Cir. 1998)).  Here, Defendant states that the only causal connection to Plaintiff's termination was her own job performance.  (Doc. No. 27 at 21).  However, the temporal proximity between Plaintiff's complaints and her termination evidences a causal link at the prima facie stage.

"[C]ourts have concluded that the discharge of an employee soon after the employee engages in protected activity is strongly suggestive of retaliatory motive and thus indirect proof of causation."  <u>Carter v. Ball</u>, 33 F.3d 450, 460 (4th Cir. 1994).  However, there are limits to the Fourth Circuit's acceptance of temporal relations between a termination and a protected activity.  "Save for situations in which the adverse employment decision follows the protected activity 'very close[ly],' 'mere temporal proximity' between the two events is insufficient to satisfy the causation element of the prima facie requirement."  <u>Perry v. Kappos</u>, 489 Fed. Appx. 637, 643 (4th Cir. 2012).

Here, Plaintiff's termination occurred within two weeks of her complaints to Henshall and within seven weeks of her initial complaints to Tatum in HR.  (Doc. No. 28 at 19).  A two-week gap between Plaintiff's latest protected activity and the adverse employment action is sufficient to prove causation at this stage of Plaintiff's claim.  The Fourth Circuit's limit to temporal proximity usually occurs when there is a gap of a month or more.[5]

---

[5] The Fourth Circuit has found that a three or four-month gap between a protected activity and an employee's discharge was "too long to establish a causal connection by temporal proximity alone."  <u>Perry</u>, 489 Fed. Appx. at 643 (quoting

D. <u>Defendant's Legitimate, Non-Discriminatory Reasoning.</u>

Defendant's legitimate, nondiscriminatory reasoning is straightforward: "Plaintiff cannot overcome the weight of the evidence documenting her failure to effectively manage the new inventory systems during the Travel Warehouse transition, her repeated inability to get along with Ms. Watts, all despite Ms. Henshall's remedial counseling." (Doc. No. 27 at 22). Defendant maintains that Plaintiff was terminated due to the combination of: (1) her poor job performance; and (2) her behavioral issues in dealing with Watts, which spread discontent to other employees. Defendant's relies on the testimony of Henshall, (Doc. No. 27-3 at 20–21, 25–27), Tatum, (Doc. No. 27-2 at 33), and several email chains revealing employees' frustration with Plaintiff's performance.[6] The Court finds this evidence more than sufficient for Defendant to successfully establish a legitimate, non-discriminatory reason for terminating Plaintiff.

E. <u>Plaintiff's Pretext Argument</u>

Plaintiff now receives the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true

_____

Pascual v. Lowe's Home Ctrs., Inc., 193 Fed. Appx. 229, 233 (4th Cir.2006)); <u>see also</u> <u>King v. Rumsfeld</u>, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding that a period of two months and two weeks was "sufficiently long so as to weaken significantly the inference of causation between the two events.").

[6] <u>See</u> (Doc. No. 27-12) (showing misunderstanding of inventory and estimated usage of products triptiks; (Doc. No. 27-10) (showing that other employees saw Plaintiff's systems an inefficient and repetitive); (Doc. No. 27-2) (showing that Plaintiff failed to communicate with another employee and the need to recount inventory); (Doc. No. 27-9) (Henshall telling Plaintiff there is no need to send out "out of stock" notices, and guiding inventory recounting process); (Doc. No. 27-13) (illustrating Plaintiff's disrespect to employees and her general behavior).

reasons, but were a pretext for discrimination." <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 143 (2000).

The Court finds Plaintiff successful in establishing a genuine issue of material fact as to pretext. First, the short period of time between Plaintiff's termination and her engagement in a protected activity is probative. As mentioned above, this *may* establish a causal connection and prima facie case of retaliation. It may also, however, establish evidence of pretext. <u>O'neill v. Henderson Cty. Hosp. Corp.</u>, CIV. 1:04CV68, 2005 WL 3797394, at *4 (W.D.N.C. June 21, 2005). There were two weeks between Plaintiff's latest protected activity and her termination. What's more, while there were seven weeks between her termination and her first complaint, Plaintiff claims that animus grew over that period of time as Henshall and Tatum conducted interviews with her team in order to find a reason to fire her. (Doc. No. 28 at 6). This evidentiary record differs markedly from one in which a company shows an effort to address issues occurring between the first and last complaint, thereby reducing the probative impact of the temporal proximity.

Second, Defendant's reasoning for Plaintiff's termination is suspect when compared to other comparators. "'[E]specially relevant' to a showing of pretext would be evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably." <u>Laing v. Fed. Exp. Corp.</u>, 703 F.3d 713, 719 (4th Cir. 2013). Defendant has consistently maintained that Plaintiff's termination derived from two factors: (1) her work performance; and (2) her behavioral issues stemming from disagreements with Watts. These two factors

have been repeated throughout Tatum and Henshall's testimony.  See (Doc. No. 27-2 at 23–24, 32–33); (Doc. No. 27-3 at 20–21, 25–27).  Even Tatum's notes commemorating Plaintiff's termination mention both factors.[7]  Defendant's explanations—though consistent on their face–simply do not add up.

In his deposition, Tatum stated, "In the HR world, if someone doesn't make a performance objective … and you tell them they need to improve, 12 days is certainly not long enough to see [improvement].  It may be three months, six months before you can see that trend improve."  (Doc. No. 27-2 at 28).  "When it's more of a behavioral issue," Tatum continued, "you should be able to see [improvement] almost immediately."  (Id.).  Defendant states that it provided Plaintiff with counseling on August 19[8]—two weeks prior to her termination.  (Doc. No. 27 at 7).  Plaintiff, however, points to Defendant's Caucasian employees who displayed behavioral issues but were not terminated as immediately as she was.  (Doc. No. 28 at 22).  Defendant responds by merely stating that other comparators did not have performance issues on top of behavioral issues.  (Doc. No. 29 at 18–19) ("None of those employees failed at the essential functions of their job like Plaintiff.").  The Court cannot reconcile Defendant's reasoning that performance issues—the issues that usually take the longest to see improvement—tip the balance of immediately discharging Plaintiff

---

[7] The note states, "Sarah advised Carlita that due to the many issues she had during the recent move of auto touring to the new space, the lack of organization, and the many disagreements she had with the manager of the warehouse, that she (Carlita) was being relieved of her management responsibilities effective immediately."  (Doc. No. 27-18).

[8] Plaintiff denies having ever received this counseling.  (Doc. No. 28 at 21).

21

while others received lenient disciplinary measures for the issues that normally justify more reactionary responses. This discrepancy is even more probative of pretext when Defendant characterizes Plaintiff's performance issues as the "predominant reason" for her demotion. (Doc. No. 27 at 17).

Third, the Court finds Plaintiff's immediate termination questionable considering her positive history with Defendant. Over a seven-year period, Plaintiff rose through the ranks from a janitor to two managerial posts. Henshall herself wrote positive performance reviews for Plaintiff. While these scores did not establish that Plaintiff met the requirements of her job at the time of her termination, it is certainly probative of the fact that Plaintiff was a successful employee in her previous managerial position. Defendant's decision to tell Plaintiff to interview for a travel agent position rather than be transferred to another position marks a drastic change in its treatment of Plaintiff after she complained about another employee's discriminatory comments.

Fourth, Defendant states that soon after the alleged August 19 counseling session, Blue told Henshall that Plaintiff continued to "create friction with her direct reports and Ms. Watts," leading her to terminate Plaintiff. (Doc. Nos. 27 at 8; 27-3 at 21–22). Plaintiff, however, presents the declaration of Blue in which he denies making such a statement. (Doc. No. 28-4 ¶10). These material facts are disputed.

C. <u>Plaintiff's Remaining Claims</u>

    1.  Plaintiff's Section 1981 Claims

Plaintiff asserts claims under §1981, which states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a); <u>CBOCS W., Inc. v. Humphries</u>, 553 U.S. 442, 445 (2008). Generally, §1981 claims are treated the same as Plaintiff's Title VII claims. <u>See</u> <u>Guessous v. Fairview Prop. Invs., LLC</u>, 828 F.3d 208, 216, 224 (4th Cir. 2016) (noting that retaliation and discrimination claims under both Title VII and §1981 use the <u>McDonnell Douglas</u> frame work and that the 4th Circuit has a "policy of treating Title VII and § 1981 hostile work environment claims the same."). However, §1981 claims do not cover national origin. <u>Saad v. Balt. Life Ins. Co.</u>, 47 F. App'x 228, 232 (4th Cir. 2002) ("Section 1981 bars discrimination on the basis of race and ethnicity, or lack of citizenship. It does not provide protection, however, for individuals discriminated against on the basis of national origin.") (internal citation and quotation omitted); <u>Rammal v. Vera</u>, No. 3:11-CV-189-MOC-DCK, 2011 U.S. Dist. LEXIS 112737, at *7 (W.D.N.C. Sep. 1, 2011).

The comments made to Plaintiff concerned her accent, which Courts have consistently found as discriminatory toward one's national origin, not race. <u>See</u> <u>EEOC v. Orkin Exterminating Co.</u>, 63 F. Supp. 2d 684, 692 (D. Md. 1999) ("Discrimination based on manner of speaking can be national origin discrimination.") (quoting <u>Ang v. Procter & Gamble Co.</u>, 932 F.2d 540, 548 (6th Cir.

1991)); <u>Bell v. Home Life Ins. Co.</u>, 596 F. Supp. 1549, 1555 (M.D.N.C. 1984) (finding that a plaintiff discriminated against due to his accent could establish a case of national origin discrimination). Of course, Plaintiff also mentions two racial remarks Watts made disparaging African Americans and Hispanics. However, Plaintiff's §1981 claim for hostile work environment must nonetheless fail because, if the Court cannot consider the comments made about Plaintiff's accent, the two other comments based on race do not alone reach a level of pervasiveness or severity for proper for a hostile work environment claim. On the other hand, Plaintiff's §1981 claim for retaliation claim does survive. Plaintiff testified in her deposition that she not only complained to Henshall about the comments made regarding her accent, but also about Watts' refusal to interview an African American ex-veteran. (Doc. No.28-1 at 71).

### 2. Plaintiff's State Law Claims

Plaintiff also posits a claim for wrongful discharge in violation of public policy. (Doc. No. 1-2 ¶¶49–54). "An employer wrongfully discharges an at-will employee if the termination is done for 'an unlawful reason or purpose that contravenes public policy.'" <u>Bigelow v. Town of Chapel Hill</u>, 745 S.E.2d 316, 324 (N.C. Ct. App. 2013). No exhaustive list of acceptable public policies exists to support a wrongful termination claim. However, "at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." <u>Amos v. Oakdale Knitting Co.</u>, 416 S.E.2d 166, 169 (1992). Here, Plaintiff cites two North Carolina statutes to support her claim of

wrongful termination based on discrimination and retaliation. (Doc. No. 1-2 ¶¶50–51). While these public policies support her wrongful termination claim in the context of employment discrimination, they fail to support her claim in the context of retaliation.

First, Plaintiff cites the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. GEN. STAT. §143-422.1, *et seq.* (Doc. 1-2 ¶50). This North Carolina statute provides that,

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. Gen. Stat. § 143-422.2(a). The Fourth Circuit and the North Carolina Court of Appeals have adopted narrow interpretations of the public policy exception to at-will employment. Johnson v. North Carolina, 905 F. Supp. 2d 712, 724 (W.D.N.C. 2012). "[I]n order for a plaintiff to recover for wrongful discharge, [she] should allege that the defendant's conduct violated [an] explicit statutory or constitutional provision, [or] allege defendant encouraged plaintiff to violate [a] law that might result in potential harm to the public." Id. (internal quotation omitted).

The NCEEPA "expresses the policy of North Carolina with respect to employment discrimination on account of race, religion, color, national origin, age, sex or handicap. It does not express a public policy concerning harassment, failure to promote or retaliation." Chung v. BNR, Inc., No. 5:97-CV-131-BR1, 1997 U.S. Dist. LEXIS 19118, at *7 (E.D.N.C. Oct. 18, 1997). Accordingly, courts have held that the

NCEEPA provides a basis for wrongful termination due to employment discrimination, but not based on retaliation or hostile work environment.[9] Therefore, Plaintiff can pursue a wrongful termination claim based on the public policy of the NCEEPA in relation to her discrimination claim only. However, Plaintiff's wrongful termination claim for discrimination fails for the very reason her Title VII claim fails.[10]

Next, Plaintiff claims that Defendant violated public policy as set forth in §95-151 of North Carolina's Occupational Safety and Health Act of North Carolina ("OSHANC"). (Doc. No. 1-2 ¶51). This statute prohibits discrimination "related to the administration" of the OSHANC based on sex, race, ethnic origin, or religion.[11] Unlike the NCEEPA, courts' treatments of §95-151's is less clear. In its Motion,

---

[9] See McLean v. Patten Cmtys., Inc., 332 F.3d 714, 719 (4th Cir. 2003) (finding no private right of action under North Carolina law for retaliation or sexual harassment under NCEEPA); Hughes v. Bedsole, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995) (recognizing an adequate state remedy for wrongful discharge in violation NCEEPA and applying the Title VII elements for discrimination); Ricketts v. Logics, LLC, No. 5:15-CV-293-D, 2017 U.S. Dist. LEXIS 158637, at *20 (E.D.N.C. Sep. 27, 2017) ("Section 143-422.2 does not create a private right of action for retaliation or provide a source of public policy concerning retaliation."); Di Wang v. WOW Brows, 1:14CV566, 2014 WL 5808370, at *2 (M.D.N.C. Nov. 7, 2014) (finding "no private cause of action exists for claims of sexual harassment and hostile work environment under NCEEPA"); Johnson, 905 F. Supp. 2d at 726 (citing Jones v. Duke Energy Corp., 43 F. App'x 599, 600 (4th Cir. 2002)).

[10] "The North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under [NCEEPA] insofar as they do not conflict with North Carolina statutes and case law." Hughes, 48 F.3d at 1383 (citing N.C. Dep't of Corr. v. Gibson, 301 S.E.2d 78, 85 (N.C. 1983)).

[11] "No employer, employee, or any other person related to the administration of this Article shall be discriminated against in any work, procedure, or employment by reason of sex, race, ethnic origin, or by reason of religious affiliation." N.C. GEN. STAT. §95-151.

Defendant cites the unpublished decision, <u>Green-Hayes v. Handcrafted Homes, LLC</u>, 2015 N.C. App. LEXIS 504, *8–10 (N.C. Ct. App. June 16, 2015), for the proposition that §95-151 applies to formal EEOC complaints, not general complaints to a manager or supervisor.

In <u>Green-Hayes</u>, The North Carolina Court of Appeals considered whether the plaintiff's protected activity was her "complain[t] of workplace discrimination to defendant's plant manager…." 2015 N.C. App. LEXIS 504 at *1. In affirming a District Court's granting of the defendant's motion to dismiss, the court found that, "[u]nlike the filing of a discrimination complaint with the EEOC, a statutorily protected activity under N.C.G.S. § 143-422.1, complaining to a plant manager and a consultant are not so protected and are insufficient under these facts to serve as the basis for a claim of retaliatory discharge." <u>Id.</u> at **8–9. Here, Plaintiff did not file an EEOC complaint until *after* her termination, thus limiting her §95-151 claim to her complaints submitted within the workplace. (Doc. No. 27 at 25). <u>Green-Hayes</u>, prevents such a claim based on workplace complaints from being successful.

Plaintiff argues that in <u>Bigelow v. Town of Chapel Hill</u>, 745 S.E.2d 316 (N.C. Ct. App. 2013), the North Carolina Court of Appeals did not require an EEOC filing— it merely provided an additional public policy that the defendant violated. (Doc. No. 28 at 15). <u>Hayes-Green</u> relied on <u>Bigelow</u> to reach its conclusion but stated that <u>Bigelow</u> contained dispositive facts not found in <u>Green-Hayes</u>. The court noted that in <u>Bigelow</u>,

> [The plaintiff] had also filed a discrimination complaint with the EEOC, which complaint was based on retaliation for reporting violations of the Occupational Safety and Health Act of North Carolina, the plaintiffs had stated a claim for wrongful discharge in violation of public policy under the Retaliatory Employment Discharge Act.

Green-Hayes, 2015 N.C. App. LEXIS 504 at *6. The court focused on the language "file a claim or complaint" found in another statute: the Retaliatory Employment Discrimination Act, N.C. GEN. STAT. §95-241. This statute states:

> No person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to do any of the following:
>
>> (1) File a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to any of the following: . . . .
>>
>> b. [OSHANC]

N.C. GEN. STAT. §95-241(a)(1)(b).[12] Before assessing the plaintiffs' claims, the North Carolina Court of Appeals in Bigelow stated:

> Although Plaintiffs' complaint is not a model of clarity, Plaintiffs need only to allege facts sufficient to support a claim that their firing was 'motivated by an unlawful reason or purpose that is against public policy.' Plaintiffs alleged they were fired in retaliation for actions in which they were legally permitted to engage, and that this constituted a violation of public policy. If these allegations are supported by alleged facts in the pleadings, Plaintiffs have pled a valid claim.

Bigelow, 745 S.E.2d at 324 (citations omitted). The court seems to have understood that one could establish a claim based on public policy against retaliation. The remaining question was just how? After citing the REDA, the court emphasized that the plaintiffs *filed* discrimination grievances and thereafter cited to §95-151. Id. at 325. The Court stated,

---

[12] Strangely, Plaintiff does not cite this statute although it expressly deals with relation claims in relation to OSHANC.

A retaliatory firing based upon an employee's *filing* of a claim of discrimination in the workplace clearly violates public policy and could support a wrongful discharge claim. Furthermore, Bigelow *initiated an EEOC charge* against Chapel Hill based upon his perceived lack of response to his discrimination grievance. Retaliation against an employee for filing an EEOC charge is also a violation of public policy.

Id. (emphasis added).

These two cases provide a common thread: the need to file a claim in some formal sense. This commonality is repeated elsewhere. In Wray v. N. Telecom, the Middle District of North Carolina found that:

No North Carolina court has extended the public-policy exception to include a claim for discharge in retaliation for complaining about discriminatory employment practices. Such extension should come, if at all, from the North Carolina courts.

CIVIL No. 1:93CV00120, 1995 U.S. Dist. LEXIS 2450, at *22 (M.D.N.C. Jan. 27, 1995). At the end of this passage, the Court inserted a footnote stating:

The North Carolina General Assembly recently demonstrated awareness of its ability to address retaliatory employment actions by enacting Article 21 of Chapter 95 of the North Carolina General Statutes. N.C. GEN. STAT. §§ 95-240 to-244 (Supp. 1992), provides a cause of action for employees retaliated against for taking various actions related to … the Occupational Safety and Health Act …. *If the General Assembly had desired to state a public policy to provide employees with a cause of action for retaliatory discharge in relation to discriminatory employment practices, it could have easily done so.*

Id. at *22 n.1 (emphasis added). This language provides further support the proposition that plaintiffs must do more than merely complain to a supervisor or manager. See also Pierce v. Atl. Grp., Inc., 724 S.E.2d 568, 574 (N.C. Ct. App. 2012) (looking to federal courts, noting that, "[b]y its plain language, it is clear that REDA does not limit protected activities to the sole act of filing a formal claim under

OSHANC," but, at the same time, "courts have held that merely talking to an internal supervisor about potential safety concerns is not a 'protected activity' under REDA.").

Plaintiff cites §95-151, which forbids discrimination in the application of OSHANC, rather than §95-241, which forbids acts of retaliation. Plaintiff's fails to explain why Defendant's reliance on <u>Green-Hayes</u> is incorrect and why her complaints should amount to more than simply complaining to a manager. Plaintiff may have established a public policy for employment discrimination, but she failed to establish a public policy under §95-121 for retaliation based upon mere complaints to supervisors in the workplace.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED THAT:**

1. Defendant's Motion for Summary Judgment, (Doc. No. 26), is **GRANTED in part and DENIED in part** as follows:

   a. Summary Judgment is GRANTED on Plaintiff's Title VII and §1981 discrimination claim;

   b. Summary Judgment is GRANTED on Plaintiff's §1981 Hostile Work Environment Claim;

   c. Summary Judgment is GRANTED on Plaintiff's state-level wrongful termination claim;

   d. Summary Judgment is DENIED on Plaintiff's Title VII hostile work environment claim; and

e. Summary Judgement is DENIED on Plaintiff's Title VII and §1981 retaliation claim.

Signed: June 19, 2018

Robert J. Conrad, Jr.
United States District Judge